Filed 7/31/23  P. v. Paredes CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B315125 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA472690) |
| v. | |
| MIGUEL A. PAREDES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mark Arnold, Judge.  Affirmed in part and remanded in part.

Jin H. Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Appellant Miguel A. Paredes was convicted of several gang-related violent crimes involving firearms. On appeal, he argues the trial court erroneously refused to consider the District Attorney's Special Directives when it considered the prosecution's motion to dismiss the gang and firearm allegations and when it allowed the introduction of preliminary hearing testimony of an unavailable witness. He also contends the gang enhancements should be vacated due to changes in the law. We affirm the convictions, vacate the true findings on the gang and firearm enhancement allegations, and remand the matter for a new hearing on the prosecution's motion to dismiss those allegations.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 1:30 a.m. on October 27, 2018, Paredes walked through a tent encampment and encountered Audriana Sandoval, Rene Figueroa, and a man called "Joe Joe." Paredes asked Figueroa where he was from; Figueroa denied being a gang member. Paredes demanded Figueroa lift his shirt, and when Figueroa hesitated, Paredes pulled out a gun and pointed it at Figueroa's head. Figueroa, concerned for his safety, complied. Paredes asked Joe Joe if he was a gang member, and Joe Joe said no. Paredes walked away toward a bridge, tagging a pillar with spray paint as he went. When Paredes painted on the pillar, he crossed out "Avenues" and painted "HLP."

Omar Herrera[1] was under the bridge with Anahi Flores when Paredes walked by holding a flashlight in one hand and a gun in the other. Paredes pointed the gun at Herrera's face,

---

[1] Herrera also used the last name "Barrera" and other aliases.

asked what gang Herrera belonged to, and identified himself as a member of the Highland Park gang. Herrera was afraid for his safety. Herrera denied gang membership, and Paredes laughed and walked on. Paredes next approached Jesus Baena, who was either a former or current member of the Avenues gang. Baena and Paredes exchanged words, and then Paredes fatally shot Baena.

Figueroa heard gunfire, then saw Paredes walking back the way he had entered the encampment. As he passed Figueroa, Paredes smiled and said, "[A]ll right, good night."

Herrera ran after Paredes and saw him enter a truck. Herrera described the truck to the police, and a truck matching Herrera's description was seen in surveillance video from the night of the shooting. The surveillance video also depicted the license plate of the truck, which led police to an address where they found the truck. The police began surveillance and Paredes was arrested.

After Paredes's arrest, he was placed in a cell with an undercover agent pretending to be a fellow inmate. Their conversations were recorded. Paredes identified himself as a Highland Park gang member, said he "popped" an "enemy" from "A-V-E-S" (the Avenues gang) under the bridge, and told the agent he had gone to the encampment for that purpose. During the conversation, Paredes described where he parked and how he entered the area. He also demonstrated how he shot the victim.

Paredes expressed the hope that the police did not find his clothes or "all the [gun]powder." The agent asked if he got rid of his clothes, and Paredes admitted he had kept his pants and had his belt with him. Paredes asked the agent to contact his family and ensure his pants were destroyed.

3

A few days after the shooting, Figueroa identified photograph numbers three and six in a photographic lineup, saying the man he saw had the facial structure of the person in photograph six but his face was more rounded, like the face of the person in photograph three. Paredes's photo was number six. Figueroa also selected a photograph in a second photographic lineup that did not include Paredes.

The police also showed Sandoval a photographic lineup. As soon as she saw the photographs, Sandoval looked scared and began to cry. Sandoval initially said, "I think that looks like him," but when the detective asked her which photograph she meant, she claimed not to know and said none of the photographs looked like the man she saw. The detective encouraged Sandoval to be strong and tell the truth and promised she would not have to write anything down. Sandoval pointed to Paredes's photograph and acknowledged she pointed at the photograph in position six.

Herrera selected Paredes's photograph from a photographic lineup but said he did not see the man well. When the detective asked Herrera to write down his identification, Herrera froze, his eyes widened, and he appeared frightened. The detective assured Herrera he did not have to write anything down, thanked him, and asked where he wanted to be dropped off. Herrera looked down, and then, after an awkward silence, he laughed nervously and said Paredes's photograph did not look like the man he had seen.

After a jury trial, Paredes was convicted of first degree murder (Pen. Code,[2] § 187, subd. (a)), two counts of assault with a

---

[2] Undesignated statutory references are to the Penal Code.

4

semiautomatic firearm (§ 245, subd. (b)), and possession of a firearm by a felon (§ 29800, subd. (a)(1)), all committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). Additionally, the jury found true the allegations that in the commission of the murder Paredes used and personally discharged a firearm, causing death (§ 12022.53, subds. (b)–(d)), and that he personally used a firearm in the commission of the assaults with a semiautomatic firearm (§ 12022.5). Paredes was sentenced to 50 years to life plus 15 years in state prison. He appeals.

## DISCUSSION

### I.    *Motion to Dismiss Special Allegations*

Section 1385, subdivision (a), provides that a judge may, upon the motion of the prosecutor, " 'and in furtherance of justice' " order an enhancement allegation dismissed. (*People v. Bonnetta* (2009) 46 Cal.4th 143, 145–146.) Prior to trial, the prosecutor filed a motion to dismiss the firearm and gang enhancements pursuant to section 1385 based on Los Angeles County District Attorney Special Directives 20-08, 20-08.1, 20-08.2, and 20-14. The court held a hearing at which the prosecutor confirmed he was seeking to dismiss the enhancement allegations solely because of the new District Attorney's policy. The court denied the motion, stating, "These allegations . . . have been enacted into law by the Legislature. Just because it's something that the newly elected district attorney doesn't like or doesn't agree with, that is not legal authority. It's not legal precedent. It does not rise to the level required in [section] 1385. [¶] I do not find that the motion to dismiss comports with the interest of justice, and therefore the motion is denied."

5

Paredes argues the court abused its discretion by refusing to consider the Special Directives. The Attorney General agrees. We review an order denying a motion to dismiss a sentence enhancement under section 1385 for an abuse of discretion. (*Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 490 (*Nazir*).) "A trial court may abuse its discretion where 'its decision is so irrational or arbitrary that no reasonable person could agree with it,' 'where the trial court was not "aware of its discretion" ' to dismiss a sentencing allegation under section 1385, or 'where the court considered impermissible factors in declining to dismiss.' " (*Ibid.*)

In deciding whether to dismiss an enhancement, "a court considers the same factors considered ' "when handing down a sentence in the first instance." ' [Citations.] These factors include those listed in California Rules of Court, rule 4.410 (general objectives in sentencing), rules 4.421 and 4.423 (circumstances in aggravation and mitigation), and rule 4.428(b) (discretion in striking an enhancement and punishment for an enhancement under section 1385). These rules refer to circumstances specific to the crime and the defendant's criminal history, as well as to broader societal objectives, such as '[d]eterring others from criminal conduct by demonstrating its consequences' and '[i]ncreasing public safety by reducing recidivism through community-based corrections programs and evidence-based practices.' (Cal. Rules of Court, rule 4.410(a)(4) & (8).) The rules state the trial court 'should be guided by statutory statements of policy, the criteria in [the Rules of Court], and any other facts and circumstances relevant to the case.' (*Id.*, rule 4.410(b).)" (*Nazir, supra*, 79 Cal.App.5th at p. 497.)

In *Nazir*, the prosecutor moved to dismiss firearm enhancements alleged under sections 12022.5 and 12022.53 based on the Los Angeles District Attorney's Special Directive 20-08, which "instructed deputy district attorneys in pending cases to move to dismiss or withdraw sentence enhancement allegations." (*Nazir*, *supra*, 79 Cal.App.5th at p. 486.) The trial court denied the motion based on its belief that it was not permitted to rely on the directive under *People v. Williams* (1998) 17 Cal.4th 148. (*Nazir*, at pp. 497–498.) The *Nazir* Court held *Williams* did not preclude the trial court from relying on the Special Directive, and therefore the trial court "misunderstood the scope of its discretion when it refused to consider Special Directive 20-08 in determining whether to grant the motion to dismiss the firearm enhancements." (*Id.* at pp. 497–498.) By its terms, the directive "was based on research showing that existing sentence enhancements do not deter crime or reduce recidivism, objectives of the criminal justice system which a court may consider in determining whether to impose a firearm enhancement under section 12022.5 or 12022.53, and thus are relevant to determining whether to dismiss an enhancement." (*Nazir*, at p. 497.)

Here, the trial court's comments that the Special Directives were not "legal authority" or "legal precedent" and did not "rise to the level" required for section 1385 indicate it refused to consider the Special Directives in determining whether to dismiss the gang and firearm allegations in the furtherance of justice. As in *Nazir,* this refusal demonstrates the court misunderstood the scope of its discretion. (See *Nazir*, *supra*, 79 Cal.App.5th at pp. 497–498.) The matter must be remanded for the trial court to consider the Special Directives, as well as the other relevant

7

factors, in determining whether dismissing the enhancement allegations is in furtherance of justice.

## II.     *Admission of Preliminary Hearing Testimony*

Herrera was the victim in count 4, one of the counts alleging assault with a semiautomatic firearm.  Herrera testified at the preliminary hearing, but he had been deported by the time of trial, approximately 18 months later.  The trial court found Herrera was unavailable because he was absent, the court was unable to compel his attendance by its process (Evid. Code, § 240, subd. (a)(4)), and the prosecution had exercised due diligence in securing his attendance at trial (Evid. Code, § 240, subd. (a)(5)).  Herrera's preliminary hearing testimony was read to the jury.  Paredes argues the court erred and his conviction on count 4 must be reversed.

### A.     Factual Background and Hearing

Herrera was incarcerated when he testified at Paredes's preliminary hearing on February 6, 2020.  On February 7, 2020, the court held Paredes to answer.  Paredes was arraigned on February 21, 2020, and the court set the trial for April 21, 2020.

Over the following year and a half, the trial was repeatedly delayed.  At the March 16, 2020 pretrial conference, the court continued the trial to April 30, 2020 at Paredes's request.  Due to the COVID-19 emergency, the court later continued the case to June 17, 2020, and then to August 3, 2020.  On August 3, 2020, at the request of counsel, the court set the trial for August 10, 2020.  At the August 10, 2020, hearing, based on the COVID-19 emergency and Paredes's request, the court set the case for pretrial conference on September 1, 2020.

8

At the September 1, 2020 pretrial conference, the court set a pretrial conference for October 5, 2020, at both counsel's request. On October 5, 2020, Paredes asked for a continuance, and the court set the pretrial conference for November 5, 2020. The case was continued to December 7, 2020, and to January 12, 2021, at both parties' request.

Paredes missed court on January 12, 2021, and at the request of both counsel, the pretrial conference was trailed to January 28, 2021, then February 17, 2021, and then March 18, 2021. Due to quarantine, Paredes missed court on March 18, 2021, and the court trailed the hearing to March 25, 2021. At Paredes's request, the court continued the case three more times: to May 3, 2021, May 10, 2021, and May 19, 2021. On May 19, 2021, the court set a trial setting date of June 8, 2021.

On June 8, 2021, the defense announced ready for trial, but over defense objection the court continued the case to July 8, 2021 because the People indicated there were outstanding discovery issues and asked for a continuance. On July 8, 2021, Paredes waived his speedy trial right and agreed the trial could begin within five days of July 12, 2021; the court transferred the case for trial.

Paredes was a medical miss-out on July 12, 2021. The defense requested the matter be sent out for trial nonetheless, but the court put it over to July 15, 2021, with instructions to defense counsel to alert the court if Paredes left quarantine sooner. Paredes was still medically unable to appear on July 15, 2021, and the case was trailed to July 19, 2021, at defense request.

The case was transferred for trial on July 19, 2021, and the next day the court held a hearing on Herrera's unavailability to

9

testify. Jason Roberts, a district attorney investigator, testified he was assigned to locate and serve Herrera with a subpoena on June 24, 2021, and began searching for him that day. Roberts searched computer databases looking for addresses for Herrera. He began with the Consolidated Criminal History Reporting System, which tracks arrest records. He checked for Department of Motor Vehicles information and searched for Herrera using a prominent search engine and social media services.

When Roberts visited the encampment and the area where the crime occurred, witness Victor Concepcion told him Herrera was in state custody. At a separate location, Roberts spoke with Flores, Figueroa, and Sandoval. All said Herrera was in custody.

The Department of Corrections and Rehabilitation confirmed for Roberts that Herrera had been in state custody but was released on September 1, 2020, at which time he was deported. Roberts called Immigration and Customs Enforcement (ICE), which confirmed Herrera had been deported on September 1, 2020.

Roberts contacted Herrera's mother and sister. Herrera's mother told Roberts she believed Herrera was in Tijuana, Mexico. Herrera's sister did not have Herrera's phone number but agreed to convey a message to him to call Roberts. Roberts came to suspect Herrera might be avoiding service based on his call with Herrera's sister. Herrera's sister said she did not trust what Roberts was saying and that Herrera had been tricked into meeting with some law enforcement agencies, leading to his deportation. She felt Roberts might be trying a similar ruse.

Roberts first spoke with Herrera's sister July 15, 2021, and he followed up with her the day before the hearing, July 19, 2021. Although Roberts had located a Los Angeles city address for

10

Herrera's mother and sister, Roberts did not go to that address, nor did he send a letter or subpoena to Herrera there.

Roberts advised ICE agent Christopher Bourdas that he was trying to locate Herrera, and Bourdas was working with an official in Tijuana to locate Herrera so Roberts could contact him. Roberts also contacted Adolfo Batres, a Los Angeles Police Department officer on the U.S. Marshal's Fugitive Task Force. Batres, too, had a contact in the Tijuana area and was attempting to locate Herrera. To date, neither contact had located Herrera.

Roberts checked local county custody records for the counties of Los Angeles, Orange, Riverside, San Bernardino, and Ventura. He learned from his database searches that Herrera used multiple names, and he ran numerous name variations through the databases to see if Herrera was present in any systems or institutions within the jurisdiction. Roberts found no sign of Herrera in the databases.

Roberts did not speak with the parole department about Herrera because he knew Herrera had been deported. The Los Angeles County Probation Department gave Roberts an address for Herrera, but when he went to that location, the person who answered the door said she had lived there for two years and did not know Herrera.

After Roberts testified, the prosecutor argued in a brief, one-sentence argument, that under *People v. Herrera* (2010) 49 Cal.4th 613, due diligence is satisfied for the purposes of the Evidence Code by making efforts to locate the witness in the jurisdiction, finding information from the Department of Homeland Security that the individual was deported, and continuing to look for the witness.

11

Defense counsel argued the investigator was insufficiently diligent because he telephoned Herrera's mother and sister but did not visit, send a subpoena, or send a letter to their address. Although defense counsel had been notified the prosecution was unable to find Herrera, she did not know until the day of the hearing that he had been deported. Defense counsel analogized the case to *People v. Roldan* (2012) 205 Cal.App.4th 969 (*Roldan*), which also involved a witness who was in custody when he testified at the preliminary hearing. In *Roldan*, she argued, the court "really analyzed whether or not the People did anything to try to secure his presence and keep his presence, knowing that he was subject to deportation while in custody." Because the People had not made significant efforts to keep the witness in *Roldan* in custody, the *Roldan* court found they had not exercised reasonable diligence.

Defense counsel argued the People knew Herrera was in custody when he testified at the preliminary hearing, as they subpoenaed him and brought him to court to testify. She contended the People had not shown they "did anything to try to maintain contact with him, knowing that this is a murder case, and knowing that he may evade the system again, to try to keep in contact with him. [¶] There were no—at least with the evidence presented today—no such efforts to say, hey, where are you going to be? Where can we find you? What phone number can we get? We didn't hear any evidence of that. The last contact that we know of is at the preliminary hearing, and that's it. The efforts started again June 24th. And defense's position, that wasn't sufficient, knowing he was in custody and could be subject to deportation."

The trial court found Herrera unavailable under Evidence Code section 240 for two reasons: "[S]ubsection (a)(4) states that the witness is absent from the hearing and the court is unable to compel his attendance by its process; and also subdivision (a)(5), the proponent, which is the People, they have exercised reasonable diligence but has been unable to procure the attendance by the court's process." The court explained, "I think what Investigator Roberts has done is he has absolutely done more than, I believe, exercise reasonable diligence. This case was set for trial 17 times prior to now and I think it would have been a waste of time and an exercise of futility to try to keep track of him during those 17 times. And that occurred over a year and a half period. [¶] I believe that the People have demonstrated that the witness is unavailable under Evidence Code section 240."

Herrera's preliminary hearing testimony was read to the jury during trial.

B.     Applicable Law

"A criminal defendant has a state and federal constitutional right to confront witnesses, but the right is not absolute. If a witness is unavailable at trial and has given testimony at a previous court proceeding against the same defendant at which the defendant had the opportunity to cross-examine the witness, the previous testimony may be admitted at trial. In a criminal case, the prosecution bears the burden of showing that the witness is unavailable and, additionally, that it made a 'good-faith effort' [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial." (*People v. Sanchez* (2016) 63 Cal.4th 411, 440 (*Sanchez*).) " '[T]he term "due diligence" is "incapable of a mechanical definition," but it "connotes persevering application, untiring

13

efforts in good earnest, efforts of a substantial character." '
[Citation.]  Relevant considerations include the timeliness of the
search, the importance of the witness's testimony, and whether
leads were competently explored."  (*Ibid*.)

"The reviewing court defers to the trial court's
determination of the historical facts if supported by substantial
evidence, but it reviews the trial court's ultimate finding of due
diligence independently, not deferentially."  (*Sanchez, supra*,
63 Cal.4th at p. 440.)

### C.    Analysis

#### 1.    *Prior to Deportation*

Paredes argues the prosecution did not undertake
reasonable efforts before Herrera was deported to secure his
presence at trial.  He relies on *Roldan, supra*, 205 Cal.App.4th at
page 980, in which the court held that due diligence requires the
prosecution to undertake reasonable efforts in order to prevent a
witness who is going to be deported from becoming unavailable
before trial.  The witness in *Roldan* had finished serving his
sentence and was being held on a federal immigration hold when
he testified at the preliminary hearing.  (*Id*. at p. 976.)  The
prosecution "knew the federal government intended to deport
[the witness] following the preliminary hearing," (*id*. at p. 981),
but did nothing; and after the hearing, the witness "was promptly
released to federal authorities and deported to Mexico."  (*Id*. at
p. 976.)  Given their knowledge of the witness's "impending
deportation," the court ruled that due diligence required the
People to take steps to "forestall his deportation prior to trial," or,
if that was not possible, at least to "increase the chances of his
returning for trial."  (*Id*. at p. 985.)

14

Here, Herrera was in state custody when he testified at the preliminary hearing, not on an immigration hold. There is no evidence the prosecution knew Herrera would be deported upon the conclusion of his prison term, and therefore the due diligence obligations outlined in *Roldan* for imminent deportations did not arise here.

Paredes does not contend there was actual evidence the prosecution knew Herrera would be deported. Instead, he argues such knowledge should be imputed to the prosecution because at the hearing, the prosecutor did not contest defense counsel's statement that it was the "defense's position, that [starting to look for Herrera on June 24, 2021] wasn't sufficient, *knowing he was in custody and could be subject to deportation*." (Italics added.) According to Paredes, the prosecutor's failure to contest this statement constituted an admission.

We strongly question whether it would be appropriate to treat the prosecution's silence here as an admission, but even if we were inclined to do so, defense counsel did not actually allege the prosecution knew Herrera was going to be deported. She argued the prosecution knew Herrera "was in custody and could be subject to deportation." "Could be" is conditional. Any person in custody *could be* subject to deportation; whether that inmate actually *is* deportable depends on whether he or she is an American citizen and on the offense committed. (See, e.g., 8 U.S.C. § 1227 [classes of deportable aliens]; § 1016.5, subd. (a) [advising defendants prior to plea of potential immigration consequences if they are not citizens].) Knowing someone is in custody and "could be" subject to deportation is not the same as knowing that person is going to be deported upon their release.

15

Paredes fails to demonstrate the prosecution knew Herrera was going to be deported or that *Roldan* applies to this case.

### 2. *Post-Deportation*

Paredes's other argument is that the prosecution failed to exercise due diligence attempting to locate Herrera after his deportation. We conclude the trial court properly ruled the prosecution exercised reasonable diligence in attempting to locate Herrera.

Roberts competently pursued the leads he had concerning Paredes's whereabouts. He spent nearly one month searching for Herrera across Southern California and in Mexico, checking databases, looking for witnesses, contacting Herrera's family, and reaching out to government officials to try to locate him in Mexico. Roberts checked criminal history and motor vehicle records; he searched the records of five Southern California counties. He ran searches using Herrera's many aliases. He went to the location of the crime, and he spoke to multiple witnesses to attempt to identify Herrera's location. Roberts also spoke with family members and tried to have a message relayed to Herrera through them.

Paredes argues the People "unreasonably delayed" its search for Herrera because the defense had announced it was ready for trial on June 8, 2021, but the investigator was not assigned to investigate until June 24, 2021. But on June 8, 2021, the court had yet again continued the matter to July 8, 2021, because of outstanding discovery issues. Given the many continuances and delays in this matter over the prior 17 months, we cannot say that waiting until two weeks before trial was an unreasonable delay. The People began the search a reasonable period of time before the trial was to start.

16

Paredes emphasizes the importance of Herrera's testimony, characterizing it as "critically important" to one of the two charges of assault with a semiautomatic firearm. This is unquestionably true, but the assault with a firearm charge was only one of four counts alleged against Paredes, and it was less serious than the primary charge, first degree murder.

Paredes argues the People should have exhausted the Bourdas and Batres leads, but this does not change our conclusion that the prosecution exercised reasonable diligence. "That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298, overruled on other grounds in *People v. Merritt* (2017) 2 Cal.5th 819, 821-822.) Due diligence does not require exhausting every lead. (*People v. Fuiava* (2012) 53 Cal.4th 622, 677 [Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry].) Thus, the court did not err in determining Herrera was unavailable as a witness (Evid. Code, § 240), and the presentation of Herrera's preliminary hearing testimony at trial did not violate Paredes's statutory and constitutional rights.

D.    The Gang Enhancements Must be Reversed

We agree with the People and Paredes that the gang enhancement findings must be reversed due to postconviction legislative changes to section 186.22. "In 2021, the Legislature passed Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which became effective on January 1, 2022 (see Stats. 2021, ch. 699). Assembly Bill 333 made the following changes to the law on gang enhancements: First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing,

*organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.)  Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a "criminal street gang," Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang.  (§ 186.22, subd. (f), italics added.)  Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang "members," as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  (§ 186.22, subd. (e)(1), (2).)  Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.'  (§ 186.22, subd. (g).)"  (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).)  These ameliorative changes apply retroactively to defendants whose convictions are not yet final.  (*Id.* at pp. 1206–1207.)

"When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error."  (*Tran*, *supra*, 13 Cal.5th at p. 1207.)  Here, reversal is necessary because, as the People

concede, Paredes's conviction is not final and the evidence presented at trial failed to establish that the predicate offenses commonly benefited a criminal street gang, and that the common benefit was more than reputational, as now required by section 186.22.

Accordingly, all gang findings and enhancements must be reversed. On remand, if the court does not dismiss the gang allegations at the hearing on the prosecution's motion to dismiss the enhancement allegations, the prosecution shall have the opportunity to retry the gang allegations under the amended requirements of section 186.22. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 346; *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 [when a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand].)[3]

---

[3] The parties agree the abstract of judgment contains an error in how firearms and gang enhancement allegations are listed with respect to one count. We need not direct that the abstract be corrected because a new abstract of judgment will be necessary after further proceedings in the trial court.

19

## DISPOSITION

The convictions are affirmed.  The gang enhancement allegation findings under section 186.22 and the firearm enhancement findings under section 12022.53 and 12022.5 are vacated.  The matter is remanded to the trial court for a new hearing on the prosecution's motion to dismiss the gang and firearm enhancement allegations and a new trial on the gang allegations if they are not dismissed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

GRIMES, J.

VIRAMONTES, J.

20