Filed 5/4/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALBERT TORRES,<br><br>    Defendant and Appellant. | B295043<br><br>(Los Angeles County<br>Super. Ct. No. NA103887) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James D. Otto, Judge. Reversed.

Steven A. Brody, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Acting Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.

————————————

We publish this opinion hoping management in prosecutorial offices will forestall more mishaps of this sort.

The situation involves witness deportation, as follows. State prosecutors would like a witness to testify at a preliminary hearing, but the witness is in federal immigration custody. State prosecutors negotiate the witness's appearance at the hearing, but they know the federal government might deport the witness after the hearing and before trial. They hope to admit the preliminary hearing testimony at trial under the former testimony exception to the hearsay rule. This exception requires the witness to be "unavailable." To satisfy the constitutional guarantee of confrontation, case law requires prosecutors to use "due diligence" to make the witness physically available for cross-examination at trial.

What, precisely, does due diligence demand of prosecutors?

The answer was laid down in 2012 by a comprehensive and well-reasoned decision called *People v. Roldan* (2012) 205 Cal.App.4th 969, 975–985 (*Roldan*).

*Roldan* overturned an attempted murder conviction because state prosecutors did not use due diligence to try to delay witness deportation. (*Roldan*, *supra*, 205 Cal.App.4th at p. 985.)

*Roldan* held that, before invoking the former testimony exception, prosecutors should react appropriately to the impending deportation risk. (*Roldan*, *supra*, 205 Cal.App.4th at pp. 979–980.) *Roldan* counseled four logical steps: alert the defense to the risk; videotape the preliminary hearing testimony; use judicial measures to try to delay deportation; and consider an array of other specific measures. (*Id*. at pp. 980–985.)

At oral argument in this case, the prosecution conceded prosecutors were simply unaware of *Roldan*. They did not

comply with it. At trial, the court admitted the witness's former testimony. Applying *Roldan*, we reverse.

I

The prosecution accused Albert Torres of stabbing Ramon Quinones on March 29, 2016. The two counts were attempted murder and assault with a deadly weapon. There were gang allegations on both counts, as well as other allegations not pertinent here.

The preliminary hearing was on August 2, 2016.

Quinones testified at the preliminary hearing he had known Torres all his life, they belonged to the same gang, and Torres stabbed him. Torres was their gang leader but tried to kill Quinones because Torres thought Quinones was attempting a coup.

Another witness at the preliminary hearing was Alex Hernandez. Hernandez testified he saw Torres and Quinones face off for a fight in an alley. Then Quinones backed up and ran off, bleeding from knife wounds. Quinones told Hernandez Torres had "gotten him with a knife . . . ." Hernandez drove Quinones for medical treatment.

For this appeal, the crucial order was the pretrial ruling about the admissibility of Hernandez's testimony from the preliminary hearing.

We recount this pretrial ruling as it evolved, day by day, and then we summarize the relevant portion of the trial by jury.

The pretrial conference began on July 18, 2017, which was day nine of 10 for trial. The court and counsel were all new to the case. None were involved in the preliminary hearing.

3

Counsel and the court discussed a sizeable range of pretrial matters, including the admissibility of Hernandez's preliminary hearing testimony.

Torres's new counsel told the trial judge that apparently Hernandez had been in the custody of Immigration and Customs Enforcement (ICE) during the August 2016 preliminary hearing and that in February 2017 ICE had deported Hernandez to Guatemala, which does not have a pertinent treaty with the United States. Torres argued the prosecution should have made reasonable efforts to prevent or delay Hernandez's deportation.

The prosecutor told the court his office file showed "arrangements had to be made with ICE at the time of the prelim to even have [Hernandez] brought into court" for that hearing. The prosecutor's office notes suggested ICE interposed "a fair amount of push-back" because "ICE was not willing to cooperate with us in bringing the witness to court," and "communication had to go relatively high up the chain of command at ICE to even have them agree to bring this witness here" for the preliminary hearing. The prosecutor reported that, when he began preparing for trial, he contacted ICE and learned Hernandez had been deported to Guatemala one week earlier. The prosecutor's office then worked, unsuccessfully, to find Hernandez or to get him back from Guatemala. The prosecutor said the U.S. and Guatemala do not have a bilateral treaty or "anything like a mutual agreement of any sort whatsoever."

The prosecutor cited *People v. Herrera* (2010) 49 Cal.4th 613 (*Herrera*) as pertinent, arguing that, under that precedent, his efforts to procure the witness after deportation established due diligence.

4

Torres responded Hernandez had been in ICE custody at the time of the preliminary hearing in August 2016 and was not deported until seven months later in February 2017. The prosecution "by their own admission" thus had cooperated with ICE to get Hernandez to the preliminary hearing in August 2016. According to Torres, this cooperation, as well as the significant delay before deportation, showed further efforts likely would have been successful in delaying deportation until trial.

The next day, on July 19, 2017, the court held an evidentiary hearing on the issue. The court heard from Earl Ackermann, an investigator from the prosecutor's office, who had tried and failed to locate leads on Hernandez *after* deportation.

The prosecution also called Jason Henshaw, an ICE deportation officer. Henshaw recounted that Hernandez had entered ICE custody on June 16, 2016, and ultimately left the U.S. on March 2, 2017, from Arizona.

Summarizing his experience with ICE, Henshaw testified (with our emphasis) that "[w]hen an alien is brought into our custody, *we usually run their criminal record for wants and warrants, and we'll reach out to the agency that usually has a want or want* [sic] *on that subject, if they want to take custody of that subject.*"

The court sustained the prosecution's objections to the ICE officer's further testimony on this score. The defense gave up its efforts to get more information: "I know yesterday Your Honor, [you] made a comment you wanted to know whether it's possible for that person to be held [without being deported]. I'm trying to get that answer. Perhaps this witness doesn't have that information, so it's the People's burden, so I have no further questions."

The parties then argued the unavailability issue to the court.  Torres said the defense, before deportation, received neither notice Hernandez was subject to deportation nor notice that ICE had him in custody pending deportation.

The prosecutor agreed the defense never got notice "of possible deportation or ICE custody."

Neither attorney ever cited the 2012 *Roldan* decision to the trial court.

Rather, the prosecutor stated, "I'm not aware of a case stating that the People have some sort of obligation to interfere with the purview of the federal government as it relates to deportation proceedings to stop or halt the deportation of a convicted felon . . . .  I'm not aware of a law that it's the People's responsibility to put on the record that a person may be deported . . . ."

*Roldan* was a case of the sort the prosecutor said "I'm not aware of . . . ."  The prosecutor made this statement in 2017.  The court decided *Roldan* in 2012.

After ordering that jurors be brought for the beginning of the trial that afternoon, the court took the daily noon break.

The hearing on the unavailability issue continued the following day, which was July 20, 2017.  The prosecution called the investigating officer on the case, who testified Torres's then-counsel (who had been retained for the preliminary hearing only) had been present at the preliminary hearing when the prosecutor told the judge she was "unsure of Mr. Hernandez's future availability due to his current immigration status at that time."

The investigating officer testified he discovered Hernandez was in ICE custody when he tried to serve him with a subpoena for the preliminary hearing.

The officer testified he made no efforts to delay Hernandez's deportation.

After this testimony, the defense continued to maintain the prosecution had duties both to ensure the witness was not deported and to notify the defense so it could do the same. The defense also argued that, at a minimum, the testimony should have been videotaped. "We've done that often as a conditional exam."

The parties submitted the matter. The court commented that it had carefully considered everything that had been argued, including the cases the prosecution cited, particularly the *Herrera* case.

The court found the prosecution had fulfilled its obligation of good faith and due diligence, that Hernandez was unavailable under Evidence Code section 240, and that the former testimony exception allowed the prosecution to introduce Hernandez's testimony from the preliminary hearing.

The court then presided over jury selection and the trial began.

At trial, the eyewitness accounts diverged dramatically in vital respects. There was some limited common ground.

The limited common ground was there had been a fight in an alley. Three people were there: Quinones, Torres, and Hernandez. Someone stabbed Quinones, who ran away and ended up in the hospital.

Beyond this common ground, at trial there was sharp conflict over who stabbed Quinones.

There were only two eyewitnesses to the stabbing: Hernandez and Quinones. Torres never testified. Hernandez had been deported and did not appear at trial. The prosecution

7

introduced testimony from the deported Hernandez by reading the preliminary hearing transcript aloud to the jury. Quinones testified in person to the jury.

The jury heard opposing stories from the only two eyewitnesses: Hernandez and Quinones. We summarize the radical conflict.

The preliminary hearing transcript recited Hernandez's statements that he had been 60 feet away when he saw Torres and Quinones facing off for a fight. Then Hernandez observed Quinones stumble backwards and take off running. Hernandez noticed Quinones was bloody: "He was cut." Quinones told Hernandez Torres had "gotten him with a knife . . . ."

We now recount Quinones's July 25, 2017, trial testimony, which the prosecution described in closing argument as "crazy," "nonsense," and "a bunch of crazy stuff." Recall: Quinones was the *victim* of the crime.

At trial, Quinones testified he was a member of the Eastside Longos gang. Quinones knew Torres but at trial claimed not to know if Torres also belonged to Eastside Longos. Shortly after that testimony, however, Quinones said he and Torres did "belong to a gang."

According to Quinones, the fight started when he and *Hernandez* began to argue. Quinones, Hernandez, and Torres all went to the alley. *Hernandez* threw a punch at Quinones. Quinones punched back at *Hernandez*. Torres was just standing there. Then Quinones felt he had been stabbed and he took off running.

At trial, Quinones gave jumbled statements about who had stabbed him. Quinones's version of events changed moment by moment. We do our best to detail his trial performance.

8

At the preliminary hearing, Quinones said Torres stabbed him. But at trial Quinones said his earlier testimony had been "a complete lie" and that he had been "under the influence" then. "I was drugged up. I was real high." Quinones also testified he had been under the influence of methamphetamine and marijuana the day he got stabbed and spoke to police. Back then, Quinones testified, he used methamphetamine "[e]very day." He was "a heavy methamphetamine user . . . ." Using methamphetamine was "an everyday thing."

At trial, Quinones testified he was unsure who stabbed him.

Then Quinones said, at the time of the stabbing, he thought it was *Torres* who stabbed him.

But then Quinones testified he thought maybe *Hernandez* stabbed him. Quinones said he owed Hernandez money for drugs, which made Hernandez mad at Quinones.

Quinones next testified "I have no idea who stabbed me."

Then Quinones testified Hernandez stabbed him.

Then Quinones testified he did not know who stabbed him.

The prosecutor asked for a sidebar and told the court he wanted to play Quinones's police interview, "given how inconsistent the victim [Quinones] has been . . . ." The prosecutor told the court, "The thing is [Quinones] has a completely new story of what happened here today; that is completely inconsistent with what he told the police. . . . [T]here has been such an about face in his demeanor in his description of the events . . . ."

Quinones then testified he told police Torres stabbed him because Quinones was trying to protect Hernandez, who was a

9

"homie" from Eastside Longos. Quinones also said police pressured him into blaming Torres.

The jury convicted Torres of attempted premeditated murder and assault with a deadly weapon. The jury rejected gang allegations but found true the enhancements about great bodily injury and a deadly weapon.

## II

At trial, *Roldan* was, or should have been, the governing law. (*Roldan*, *supra*, 205 Cal.App.4th at pp. 975–985.) This thoughtful and thorough 2012 decision is central to our analysis. First we recount *Roldan* in detail. Then we apply it, because we agree with it.

## A

The *Roldan* case arose when Juan Roldan fired three shots at Sabas Barrera in 2006. (*Roldan*, *supra*, 205 Cal.App.4th at p. 973.) The wounds hospitalized Barrera until spring 2007. (*Ibid*.) Police arrested Barrera in 2008 for a probation violation. (*Ibid*.) Barrera served a five-month sentence ending in December 2008 but remained in custody nine more months on a federal immigration hold, until Roldan's preliminary hearing in September 2009. (*Ibid*.) Barrera testified at the preliminary hearing and then "was promptly released to federal authorities and deported to Mexico." (*Id*. at p. 976.)

Roldan's trial began in February 2010. (*Roldan*, *supra*, 205 Cal.App.4th at p. 976.) Over Roldan's protest, the trial court admitted Barrera's testimony from the preliminary hearing. (*Id*. at p. 978.) The jury convicted Roldan. (*Id*. at p. 975.)

The Court of Appeal reversed. (*Roldan*, *supra*, 205 Cal.App.4th at p. 987.) It ruled former testimony from a preliminary hearing is inadmissible unless the witness is

"unavailable," which required Roldan's prosecutors to use due diligence to have Barrera testify at trial in person. (*Id.* at p. 979; see Evid. Code, §§ 1291 [hearsay exception for former testimony], 240 [defining "unavailable"].)

The *Roldan* court independently reviewed whether the prosecution's effort amounted to due diligence. (*Roldan, supra*, 205 Cal.App.4th at p. 980.) The court recited the burden is on the government to prove it used due diligence to get a witness to trial. (*Ibid.*)

*Roldan* began its analysis from the premise state prosecutors have no ability to block deportation if the federal government is determined to deport someone swiftly. (*Roldan, supra*, 205 Cal.App.4th at p. 980.) Unquestionably, federal power is supreme. But *Roldan* explained state prosecutors could take four interstitial steps that might be effective in various ways and that are germane to a judicial evaluation of whether the prosecution has been diligent. (*Id.* at pp. 980–985.).

These four steps are these:
1. Before the preliminary hearing, tell the defense about the deportation risk.
2. Videotape the preliminary hearing testimony.
3. Try judicial remedies.
4. Try other specific measures.

We review *Roldan*'s four steps in more detail.

First, the prosecution should tell the defense before the preliminary hearing if it knows about a risk of deportation. This information would help the defense in two ways: (1) by allowing the defense to prepare a cross-examination complete enough for trial as well as for just the preliminary hearing, and (2) by permitting the defense to videotape the testimony. (*Roldan,*

11

*supra*, 205 Cal.App.4th at pp. 976, 981, 985.)  Videotaping can help combat the central problem with hearsay testimony, which is jurors' inability to sit face-to-face and to judge witness credibility for themselves during direct and cross-examination. (*Id.* at p. 981.)

Second, the prosecution should make its *own* effort to videotape the testimony.  (*Roldan*, *supra*, 205 Cal.App.4th at pp. 980–981.)

Third, the prosecution can attempt to secure the witness's trial attendance by pursuing state judicial remedies, such as an order under section 1332 of the Penal Code detaining a material witness.  (*Roldan*, *supra*, 205 Cal.App.4th at pp. 981–983.)  The *Roldan* court was unable "to understand why the prosecution would not have *sought* such an order; its position would certainly be stronger today if it had tried and been refused."  (*Id.* at p. 982.)

Fourth, the prosecution can try a range of other measures, including informal efforts to delay deportation until after trial. (*Roldan*, *supra*, 205 Cal.App.4th at pp. 983–985.)  *Federal* regulations recognize the *federal* interest is generally to delay deporting witnesses needed in pending criminal cases.  (*Id.* at p. 983; 8 C.F.R. §§ 215.2, 215.3 (2019).)  When witnesses to state crimes are in federal custody, moreover, *federal courts* have the power to issue writs of habeas corpus ad testificandum at the request of *state* prosecutorial authorities.  (*Roldan*, *supra*, 205 Cal.App.4th at pp. 983–984.)

Furthermore, many informal contacts exist between federal and state law enforcement officials.  These law enforcement officials generally share law enforcement objectives.  If state prosecutors kept a particularized record of their earnest efforts to

12

exploit these contacts, this record would support claims of due diligence.  (*Roldan*, *supra*, 205 Cal.App.4th at pp. 984–985.)

The *Roldan* decision also listed other measures that prosecutors could take:

- Subpoena the witness who may be deported.
- Before deportation, give that witness written notice about the trial.
- Impress upon witnesses they are material witnesses and get their assurance they will return for trial.
- Give these witnesses contact information so they can stay in touch with authorities here.
- Provide witnesses with information and resources to facilitate their reentry to the United States to testify at trial.
- Obtain (or make a record of attempts to obtain) reliable contact information about family in the United States and in the nation to which the witness will be deported.  (*Roldan*, *supra*, 205 Cal.App.4th at p. 984.)

The *Roldan* decision acknowledged these measures ultimately might fail to delay deportation.  (*Roldan*, *supra*, 205 Cal.App.4th at pp. 984–985.)  The decision also clarified no one step was necessarily mandatory.  (*See id*. at pp. 980–985.)  Rather, a reviewing court would take the record as a whole before determining whether the prosecution had exercised due diligence determination.  But the prosecution "cannot simply throw up its hands and do nothing when faced with the prospect of one of its witnesses being deported or leaving the country on his own accord.  Instead, it must undertake reasonable efforts to preserve

the defendant's constitutional right to be confronted with the witnesses against him." (*Id.* at p. 980.)

*Roldan* repeatedly cited the *Herrera* decision. (E.g., *Roldan, supra,* 205 Cal.App.4th at p. 983.) *Herrera* admitted former testimony from a deported witness where there was no evidence the prosecution knew or should have known of the witness's immigration status or of any pending deportation issue. (*Herrera, supra,* 49 Cal.4th at p. 630.) Ordinarily, the prosecution is not required to keep periodic tabs on every material witness in a criminal case. (*Ibid.*) *Roldan* held the situation is different when the prosecution knows witness deportation is likely. (*Roldan, supra,* 205 Cal.App.4th at p. 980.)

B

This case is like *Roldan.* In both instances, prosecutorial efforts fell short of due diligence.

The prosecutors in both cases searched for the deported witness *after* deportation. But the requirement of due diligence includes the duty to make reasonable efforts *before* deportation when, as here, the prosecution knows there is a risk of deportation. The prosecution cannot establish due diligence if it fails in its pre-deportation duty. (*Roldan, supra,* 205 Cal.App.4th at p. 980.)

In this case, the prosecution effectively did nothing to comply with *Roldan.* The prosecutors did not satisfy *Roldan* by mentioning, off the record, they were "unsure of Mr. Hernandez's future availability due to his current immigration status at that time." As the prosecution conceded at oral argument on appeal, "probably a lot of people are illegal" but are not actively in deportation proceedings.

14

## C

This case differs from *Roldan* in two ways. Both differences favor Torres. First, the prosecutors in *Roldan* did more to secure the witness than did the prosecution in this case. Second, the federal government showed less willingness to cooperate with state prosecutors in *Roldan* than in this case. We explain.

### 1

The prosecution in *Roldan* did something to delay deportation, but the prosecution in this case did nothing.

In *Roldan*, both the prosecutor and her investigator contacted federal immigration officials to find "some type of remedy" to delay deportation of witness Barrera. (*Roldan, supra,* 205 Cal.App.4th at p. 977.) The investigator could not remember whom he contacted or when he took this action, but the prosecutor's office did make an effort to delay Barrera's deportation. (*Ibid.*)

In this case, the record before deportation is of prosecutorial inaction. The prosecution's brief in this court admits the investigating officer "did not do anything to ensure that Hernandez would not be deported." Nor is there other evidence of prosecutorial efforts to delay Hernandez's departure or to videotape his testimony at the preliminary hearing.

### 2

Second, this record shows more federal willingness to cooperate with state prosecutors than was evident in *Roldan*. In *Roldan*, ICE told a state investigator "Barrera was going to be deported, and there was nothing [the state investigator] could do about it." (*Roldan, supra,* 205 Cal.App.4th at p. 977.) By contrast, in this case the ICE deportation officer testified (with

15

our emphasis) that "[w]hen an alien is brought into our custody, *we usually run their criminal record for wants and warrants, and we'll reach out to the agency that usually has a want or want [sic] on that subject, if they want to take custody of that subject.*" The court sustained the prosecution's objections to the ICE officer's further testimony on this topic. Federal attitudes about cooperation probably will vary, but this factor on this record favors Torres.

### D

In sum, *Roldan* controls our analysis because the facts about prosecutorial diligence are weaker here than they were in *Roldan,* where the appellate court held for the defense. On lopsided facts, we follow *Roldan*'s guidance.

### E

The prosecution incorrectly contends the *Roldan* error was harmless beyond a reasonable doubt, which implicates the federal constitutional right of confrontation. The parties agree the *Chapman* standard governs. (See *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).) *Chapman* rejected the notion of automatic reversals for all federal constitutional errors, regardless of the facts and circumstances. Rather, some federal constitutional errors in the setting of a particular case are so unimportant and insignificant that they may be deemed harmless. (*Chapman, supra,* 386 U.S. at pp. 21–22.)

The question thus is whether there is a reasonable possibility the evidence complained of might have contributed to the conviction. (*Chapman, supra,* 386 U.S. at p. 23.)

The answer is yes. If we subtract Hernandez's hearsay testimony from the trial evidence, this leaves only one testifying eyewitness to the stabbing: victim Quinones. The *prosecution*

16

described Quinones's trial performance as "a bunch of crazy stuff." We already have recounted Quinones's uncontradicted vacillation and uncontradicted drug use. We agree with the prosecution's description. Quinones was too crazy a witness to be the sole foundation for a conviction for attempted murder.

Fear of gang retribution is the probable reason Quinones recanted his early statements identifying Torres as the stabber. Recantations are common in gang and domestic violence cases. But between the methamphetamine and his continuously evolving contradictions, Quinones proved himself an impressively unreliable witness. Without Hernandez, the confluence of facts at trial did not establish Torres's guilt for these crimes beyond a reasonable doubt.

In one brief paragraph, the prosecution's brief to us makes a halfhearted effort to marshal proof of guilt. But this cursory showing is not proof beyond a reasonable doubt.

Torres repeatedly asked an officer whether, "if there's no victim, [do] I get out of jail?" Torres's questions tend to incriminate him of victimizing someone in some way, but this is proof of neither attempted murder nor assault with a deadly weapon. For this reason, perhaps, the prosecution devotes one sentence to this argument.

The prosecution notes Torres received a text message from someone else saying Quinones was "no good in the gang culture anymore" and "should be targeted." The reply on Torres's phone was "Been trying to let you know." This evidence may have been helpful to the prosecution when taken together with a mass of other proof, but by itself it is too ambiguous to be proof of these crimes beyond a reasonable doubt.

17

The prosecution argues the severity of the knife wounds shows an intent to kill. This evidence, however, does not show who inflicted these wounds.

Evidence showed Torres's phone was in the vicinity of the stabbing, but the key question is not whether Torres was in the alley—all agreed he was—but rather whether the stabber was Torres. The phone evidence did not identify the stabber.

The prosecution cites no precedent for finding harmless error on facts like these.

"[I]t is completely impossible for us to say that the State has demonstrated, beyond a reasonable doubt, that [Hernandez's testimony] did not contribute to [Torres's] convictions." (*Chapman*, *supra*, 386 U.S. at p. 26.)

### III

Torres makes a separate sentencing argument. We note its validity to ensure the parties do not repeat the error in this case. Torres waived jury for a bifurcated trial on the truth of the allegations he had been convicted of prior offenses. Docket entries show the court never held this trial. This trial will be necessary if Torres is convicted on these charges.

### DISPOSITION

The judgment is reversed and remanded for further proceedings consistent with this opinion.


WILEY, J.

I concur:


STRATTON, J.

18

**People v. Torres**
**B295043**

BIGELOW, P.J., Dissenting in part, and concurring in part:

When first arrested, Torres said "May I ask you a question? . . . . If the victim did not want to be a victim would [I] be let go?" He asked police the same question two more times. As it turned out, this case played out just as Torres wanted, as it does in many gang cases that go to trial: the victim recanted his original statements to police and his preliminary hearing testimony identifying Torres as his lone attacker, owing to his fear of gang retaliation. The jury saw through the scheme and convicted. Unfortunately, the majority does not. Instead, it answers Torres's repeated question with an unequivocal yes. I would not.

To reach its decision, the majority applies an exception to the general rule that prosecutors need not keep periodic tabs on witnesses, most recently discussed in *People v. Roldan* (2012) 205 Cal.App.4th 969 (*Roldan*), and finds the prosecution had a duty to prevent Hernandez from being deported. In doing so, it significantly expands the holding in *Roldan*, as well as the California Supreme Court precedent in *People v. Louis* (1986) 42 Cal.3d 969 (*Louis*), upon which *Roldan* was based. The majority also disregards applicable United States Supreme Court authority in *Ohio v. Roberts* (1980) 448 U.S. 56,[1] which directs that the prosecution need not make efforts for which there is a "great improbability" of locating a witness and producing him at trial. (*Id.* at pp. 75–76.) In addition, the majority finds—for the

---

[1] Overruled on other grounds by *Crawford v. Washington* (2004) 541 U.S. 36.

1

first time–that a prosecutor must give advance written notice, on the record, of a witness's potential unavailability. For these reasons, I cannot join in its decision.

### *The Unavailable Witness Issue*

The federal and state Constitutions guarantee defendants the right to confront prosecution witnesses at trial. (U.S. Const., 6th Amend.; Cal. Const. art. I, § 15.) That right, however, is not absolute. There is an exception when a witness is unavailable and, at a previous court proceeding against the same defendant, the witness gave testimony that was subject to cross-examination. Under federal law, this testimony is admissible if the prosecution made a good-faith effort to obtain the witness's presence at trial. (*Hardy v. Cross* (2011) 565 U.S. 65, 69–70.) Under California law, a witness is unavailable if the prosecution exercised due diligence but is unable to procure the witness's attendance by use of court process. (*People v. Fuiava* (2012) 53 Cal.4th 622, 674–675 (*Fuiava*); *People v. Bunyard* (2009) 45 Cal.4th 836, 848–849 (*Bunyard*); Evid. Code, §§ 1291, subd. (a) & 240, subd. (a)(5).)

A witness is also considered unavailable if he or she is "[a]bsent from the hearing and the court is unable to compel his or her attendance by its process." (Evid. Code, § 240, subd. (a)(4).) "In contrast to [Evidence Code] section 240[, subdivision] (a)(5), [Evidence Code] section 240[, subdivision] (a)(4) makes no mention of a 'reasonable diligence' requirement, thus indicating the Legislature's intent to dispense with such a showing in those cases where the court has no power to compel the witness's attendance." (*People v. Herrera* (2010) 49 Cal.4th 613, 622–

2

623 (*Herrera*).)  Nonetheless, unavailability in the constitutional sense requires "a determination that the prosecution satisfied its obligation of good faith in attempting to obtain" the witness's presence.  (*Id.* at p. 623.)

As the California Supreme Court explained in *Fuiava*, " 'the term "due diligence" is "incapable of a mechanical definition," but it "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character." [Citations.]  Relevant considerations include " 'whether the search was timely begun' " [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation].' [Citation.]" (*Fuiava, supra*, 53 Cal.4th at p. 675.)  "[I]n those cases in which courts have not found adequate diligence, the efforts of the prosecutor or defense counsel have been perfunctory or obviously negligent. . . .  On the other hand, diligence has been found when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period." (*Bunyard, supra*, 45 Cal.4th at pp. 855–856.) " 'Where the record reveals, . . . that sustained and substantial good faith efforts were undertaken, the defendant's ability to suggest additional steps (usually . . . with the benefit of hindsight) does not automatically render the prosecution's efforts "unreasonable." [Citations.]  The law requires only reasonable efforts, not prescient perfection.' [Citation.]  'That additional efforts might have been made or other lines of inquiry pursued does not affect [a] conclusion [there was due diligence]. . . .  It is enough that the People used reasonable efforts to locate the witness.' [Citation.]  A court cannot 'properly impose upon the People an obligation to keep "periodic tabs" on every material witness in a criminal case, for the administrative burdens of

3

doing so would be prohibitive.'" (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706 (*Diaz*).)

"[W]hen a criminal trial is at issue, unavailability in the constitutional sense does not invariably turn on the inability of the state court to compel the out-of-state witness's attendance through its own process, but also takes into consideration the existence of agreements or established procedures for securing a witness's presence that depend on the voluntary assistance of another government. ([*Mancusi v. Stubbs* (1972) 408 U.S. 204, 211–213].) Where such options exist, the extent to which the prosecution had the opportunity to utilize them and endeavored to do so is relevant in determining whether the obligations to act in good faith and with due diligence have been met. [Citations.]" (*Herrera, supra,* 49 Cal.4th at p. 628, fn. omitted.) However, "when the prosecution discovers the desired witness resides in a foreign nation, and the state is powerless to obtain the witness's attendance, either through its own process or through established procedures, the prosecution need do no more to establish the witness's unavailability"; good faith requires no additional efforts by the prosecution. (*Herrera, supra*, at p. 625; see also *People v. Ware* (1978) 78 Cal.App.3d 822, 837; *People v. St. Germain* (1982) 138 Cal.App.3d 507, 517.)

"[W]e review the trial court's factual findings under the substantial evidence standard and independently review whether the facts demonstrate prosecutorial good faith and due diligence." (*Herrera, supra,* 49 Cal.4th at p. 628.)

4

The unavailable witness here, Alex Hernandez, was charged with a felony and being held in federal ICE custody when he testified at the preliminary hearing on July 27, 2016. He was deported to Guatemala on March 2, 2017, some four and a half months before trial commenced on July 24, 2017. The case was not vertically prosecuted; the trial prosecutor received the case in January 2017. He reached out to ICE in mid-March and was told Hernandez had very recently been deported to Guatemala. The prosecutor learned from attorneys at the United States Department of Justice that the United States has no formal ability to compel service or testimony from someone located in Guatemala.

Nevertheless, the prosecutor directed his investigator to try to locate Hernandez, with the hopes that, even if he could not be compelled to attend trial, he would do so voluntarily. The investigator contacted Hernandez's former probation officer and searched the district attorney's databases, looking for any information on Hernandez and his relatives and friends. The investigator then personally visited several addresses associated with Hernandez, spoke to his former employer, and tracked down the owner of a phone number that may have once belonged to Hernandez. The prosecution ultimately was unable to locate Hernandez.

Based on these facts, the trial court concluded the prosecution made sufficient efforts to make Hernandez available for trial. The court explained:

> "I've carefully considered everything that's been argued, reviewed the case, . . . . *People v. Herrera.*
> "There appears to be no dispute that there was no type of extradition cooperation treaty between

5

Guatemala and the United States in effect. There's not one now, based on the citation and the undisputed statement by counsel.

"Considering all the obligations, I find the prosecution has fulfilled his obligations of good faith and due diligence, under the circumstances, the totality of the circumstances to get Mr. Hernandez here and that they have done that adequately so that I find that he is now unavailable under Evidence Code section 240 and his preliminary hearing testimony can be used in this case."

Reviewing the record, I find substantial evidence supports the trial court's factual findings. Moreover, although ultimately fruitless, there is no question the prosecution made reasonable efforts to try to locate Hernandez and secure his appearance at trial after learning he had been deported to Guatemala. I would therefore conclude the prosecution fulfilled its state and federal duties of good faith and due diligence, Hernandez was an unavailable witness, and admission of his preliminary hearing transcript was proper. (See *Herrera, supra,* 49 Cal.4th at p. 625; *Mancusi v. Stubbs, supra*, 408 U.S. at pp. 212–213 [the good-faith standard was met where the witness resided in a foreign nation and the state was powerless to compel his attendance at trial].)

The majority comes to the opposite conclusion, finding the prosecution had a duty to attempt to prevent Hernandez from being deported based on an exception most recently discussed in the appellate court decision in *People v. Roldan, supra,* 205 Cal.App.4th 969. The majority

6

castigates the prosecution for being unaware of the case. While I agree both the court and counsel should have known about the *Roldan* case, I find the exception does not apply to the facts here. To squeeze this case within its confines, the majority significantly expands the holdings in *Roldan* and its California Supreme Court genesis, *People v. Louis, supra*, 42 Cal.3d 969. The majority also ignores the decades-old mandate from the United States Supreme Court that the prosecution need not make efforts for which there is a "great improbability" of locating a witness and producing him at trial. (*Ohio v. Roberts, supra,* 448 U.S. at pp. 75–76.) Finally, the majority legislates the unprecedented rule that a prosecutor must give advance written notice, on the record, of a witness's potential unavailability.

In *Roldan*, the unavailable witness, Sabas Barrera, was the victim and sole witness to a gang-related attempted premeditated murder. (*Roldan, supra*, 205 Cal.App.4th at pp. 973–976.) At the time of the preliminary hearing, Barrera was in federal custody, but being housed at an Orange County jail. (*Id*. at p. 977.) The prosecution knew he was in the process of being deported by the federal government. Barrera was subsequently deported, but the defense did not learn that fact until the first day of trial. (*Id*. p. 976.) The prosecution sought to admit Barrera's preliminary hearing transcript into evidence as an unavailable witness. (*Ibid*.)

The District Attorney Investigator in *Roldan*, Kevin Ruiz, said there were no charges pending against Barrera as of the preliminary hearing, and he was being held solely because of his immigration status. (*Roldan, supra*, 205 Cal.App.4th at p. 977.) Ruiz testified the federal government was willing to hold off deporting Barrera until after the preliminary hearing, but not

7

beyond, which Ruiz testified was consistent with his experience in other cases. (*Ibid*.) "He said there used to be a 'protocol' in place under which illegal aliens facing deportation could be kept in custody longer if they were witnesses to state crimes. However, 'because of a change over in the federal government because of cost, they decided basically that they weren't going to' do that anymore." (*Ibid*.) Ruiz tried to keep Barrera in the United States, but federal officials told him "in so many words— that Barrera was going to be deported, and there was nothing he could do about it." (*Ibid*.) The prosecution did not attempt to secure Barrera's testimony by placing a material witness hold on him. (*Ibid*.) However, the prosecutor kept in contact with federal officials and made efforts to hold him in custody by writing "emails, letters, et cetera," and trying to get federal authorities to release Barrera to their custody. (*Ibid*.)

The trial court found, and Roldan conceded on appeal, that the prosecution had used good faith and due diligence in attempting to secure Barrera's presence at trial based on its pretrial attempts to secure his presence following his deportation. (*Roldan, supra*, 205 Cal.App.4th at p. 980.) Roldan contended instead that the state did not make sufficient effort to prevent Barrera from being deported. (*Ibid*.) The Court of Appeal agreed. Reiterating the holding in *Louis*, it held that the state has a duty to prevent a "key" witness for the prosecution from becoming unavailable. (*Roldan, supra*, at p. 980.) Barrera was clearly a key witness for the prosecution as he provided the only direct evidence implicating Roldan as the shooter.

8

In *Louis*, *supra*, 42 Cal.3d 969, the defendant was convicted and sentenced to death for murder with a special circumstance. (*Id*. at p. 974.) His codefendants, who were tried to a separate jury, were acquitted. (*Ibid*.) The only difference between the trials was, in the defendant's case, the jury was read prior testimony of a prosecution witness, Tolbert, "whose credibility was indisputably minimal. Although known to be highly unreliable and likely to disappear, the witness was released from custody on his own recognizance before defendant's trial through the efforts of the prosecution; the witness promptly vanished. After trial the codefendants went free; defendant was convicted and sentenced to death." (*Ibid*.) The court described Tolbert as the most significant witness in the prosecution's case, because his testimony was "the sole evidence identifying defendant as the trigger man . . . ." (*Id*. at p. 989.) The prosecutor said "it was [Tolbert's] testimony and [Tolbert's] testimony alone which enabled us to identify [defendant] as the shooter in this case . . . ." (*Ibid*., italics omitted.) The California Supreme Court reversed the judgment because "the reading of that prior testimony—which came from a most questionable source but plainly spelled the difference between life and death—was admitted in violation of defendant's constitutional and statutory right of confrontation . . . ." (*Id*. at p. 974.)

In a subsequent case, the California Supreme Court described its holding in *Louis* as follows: "[I]f a particular witness's testimony is deemed 'critical' or 'vital' to the prosecution's case, the People must take reasonable precautions to prevent the witness from disappearing. [Citation.] [In *Louis*], the People honored witness Tolbert's own request for an 'own recognizance' release on theft charges, knowing of a substantial

9

risk that this important witness would flee. Because the People failed to take adequate preventative measures, such as holding Tolbert as a material witness pending defendant Louis's trial, no due diligence was shown." (*People v. Hovey* (1988) 44 Cal.3d 543, 564 (*Hovey*).) The Supreme Court clarified, however, that the prosecution does not have an "obligation to keep 'periodic tabs' on every material witness in a criminal case, for the administrative burdens of doing so would be prohibitive." (*Id.* at p. 564.)

These cases make evident there are two prerequisites to eschewing the ordinary rule that the state is not required "to keep periodic tabs" on every material witness or undertake means to prevent a present witness from becoming absent. First, the witness must be "vital" or "critical" to the prosecution's case. (*Hovey, supra*, 44 Cal.3d at p. 564.) In the two cases where the standard has been met, the witnesses were the *sole witness upon which the prosecution relied for direct proof of the defendant's guilt*. In *Louis*, the witness was described as the "sole witness identifying defendant as the gunman"; in *Roldan*, the witness was described as the "sole witness to the gang attempted murder." (*Louis, supra*, 42 Cal.3d at p. 989; *Roldan, supra*, 205 Cal.App.4th at p. 976.) In *Hovey*, in contrast, the witness was not "vital" to the prosecution's case because his testimony would have been largely cumulative of another witness's testimony. (*Hovey, supra*, 44 Cal.3d at p. 564.)

Second, the prosecution must know there is a "substantial risk" the witness will become unavailable. (*Hovey, supra*, 44 Cal.3d at p. 564.) In *Louis*, the Supreme

10

Court found this factor was met where the witness was "likely to disappear" if released from custody on his own recognizance. (*Louis*, *supra*, 42 Cal.3d at p. 974.)  In *Roldan*, the uncontradicted testimony showed the state knew, as of the preliminary hearing, the witness was "already in the process of being deported by the federal government."  (*Roldan, supra*, 205 Cal.App.4th at p. 976.)  The state had also been told the deportation was going forward, no matter what it did.  (*Id*. at pp. 976–977.)

Here, the majority expands both factors well beyond *Louis* and *Roldan*.  As I discuss below, its decision will require the prosecution to keep tabs on all material witnesses, not just those that are "critical" or "vital."  It will also require the prosecution to expend significant resources to monitor witnesses whose future availability is "uncertain" due to their immigration status, not just those it knows to be facing certain deportation.  Further, it must give written notice to the defense when there is a possibility a witness may become unavailable.

As to the first factor—that the witness be "critical" or "vital"—we evaluate the facts "as they then appeared and as favorably as the law and the facts allow" (*Louis*, *supra*, 42 Cal.3d at p. 991), not with the "prescient perfection" of hindsight (*Diaz*, *supra*, 95 Cal.App.4th at p. 706).  Here, although Hernandez's testimony was important, he was certainly not the "sole witness" to Torres's attack; Quinones was alive and well, and he initially seemed to be a solid cooperating witness.  At the time Hernandez was held in ICE custody, the prosecution thought it could count on an unwavering victim's eyewitness testimony clearly identifying Torres as his lone attacker.

11

It was just at trial—when Quinones was in custody and the threat of retaliation against him was imminent—that he recanted his initial statements to police and preliminary hearing testimony. Only then did Hernandez's testimony take on the significance the majority and Torres ascribe to it. But the cases direct us to look at the facts as they existed at the time of the unavailability hearing, not as they turned out at trial and not with the "prescient perfection" of hindsight. (*Diaz, supra,* 95 Cal.App.4th at p. 706; *Louis, supra,* 42 Cal.3d at p. 991.) When looking through the wrong lens, it's easy to come to the wrong conclusion.

The majority also expands the second factor, which requires the prosecution know there is a "substantial risk" the witness will become unavailable. Here, unlike *Roldan,* the prosecution did not know Hernandez's deportation was certain as of the preliminary hearing. Instead, the prosecution knew only that he was being charged with a felony and was in the custody of federal immigration authorities. Thus, at the time of the preliminary hearing, the prosecution could not know whether Hernandez would be deported or convicted and incarcerated.

Indeed, according to Solorio—who gave the only testimony indicating the prosecutor's state of mind on this topic—the prosecutor "didn't say [she] 'anticipate[d Hernandez] being deported.' She didn't say those words. She just said she doesn't know what's going to happen to him due to his current immigration status." Even the majority admits the prosecution knew only that "the federal government *might* deport the witness before trial." The

12

majority, however, simply brushes aside this fact and effectively expands *Roldan* beyond cases in which deportation is certain, to all cases where there is merely an "impending deportation risk."

If the rule requiring the prosecution prevent witnesses from becoming unavailable is expanded to all material witnesses with an "impending deportation risk"—as the majority opinion effectively does—the 58 District Attorney's offices in this state will need to expand the size of their witness coordination units and hire more investigators just to keep track of them all. In large counties like Los Angeles, the District Attorney might need to permanently assign members to a "Deportation Prevention Unit," whose sole job is to pursue the laundry list of actions the majority seeks to impose upon them, including: notifying the defense about the deportation risk, videotaping preliminary hearing testimony of such witnesses, and seeking to stave off their deportation or hold the witnesses in custody by the use of federal regulations, a material witness hold, or a writ of habeas corpus ad testificandum. In addition, they will need extra funding to comply with the majority's requirements to: "Subpoena the witness who may be deported; Before deportation, give that witness written notice about the trial; Impress upon the witness that they are [a] material witness and obtain their assurance they will return for trial; Give these witnesses contact information so they can stay in touch with authorities here; Provide witnesses with information and resources to facilitate their reentry to the United States to testify at trial; Obtain (or make a record of attempts to obtain) relatable contact information about family in the United States and in the nation to which the witnesses will be deported." Keep in mind, the District Attorney will have to keep this up during the many

months, and sometimes years, between preliminary hearing and trial.  As I see it, expanding the *Louis/Roldan* exception as the majority seeks to do would require exactly the prohibitive administrative burdens the California Supreme has indicated should not be imposed; it is precisely the reason why the prior cases have narrowly construed the circumstances under which the prosecution must keep tabs on its witnesses.

But even if I am wrong and the *Louis/Roldan* exception applies, the prosecution's efforts still meet the requisite good-faith standard, although barely.  It is of no consequence that this was not the basis for the trial court's ruling since, "[o]n appeal, a correct decision must be affirmed even if the trial court based its ruling on an erroneous reason." (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1580; accord *People v. Lujano* (2014) 229 Cal.App.4th 175, 182.)  Here, the prosecution made the minimum effort articulated in *Roldan*, and it was not required to take further futile acts.  After summarizing various avenues by which the prosecution may have been able to secure the witness's appearance at trial, the *Roldan* court explained there was one final action the prosecution could have taken:  timely notifying defense counsel of the witness's impending deportation. (*Roldan, supra*, 205 Cal.App.4th at p. 985.)  The court characterized this as the "absolute minimum" the prosecution should have done to comply with its due diligence requirements. (*Ibid.*)

In this case, there is uncontradicted evidence showing the prosecution satisfied this "absolute minimum" by giving defense notice at the preliminary hearing that Hernandez might become unavailable.  Richard Solorio, who was the investigating officer on the case, testified that

14

during the preliminary hearing, the prosecutor wanted to admit into evidence an audio recording of a prior interview with Hernandez. Solorio said that, in a discussion held off the record, the prosecutor explained to the judge and defense counsel she wanted to do so because she was unsure whether Hernandez would be available at trial given his immigration status. Solorio testified the prosecutor said she "was unsure of Mr. Hernandez's future availability due to his current immigration status . . ." and that "she doesn't know what's going to happen to him due to his current immigration status." The prosecution, in other words, made defense counsel aware that Hernandez's immigration status might make him unavailable for trial. As a result, unlike in *Roldan*, defense counsel had a meaningful opportunity to cross-examine Hernandez more thoroughly at the preliminary hearing or to recess and arrange to memorialize his testimony on videotape. To the extent defense counsel did not take advantage of those options, I cannot fault the prosecution, which did what was required of it.

Further, it is very likely defense counsel already knew Hernandez might not be available at trial even before the off-the-record discussion took place, because defense counsel never batted an eye after hearing about it. The preliminary hearing transcript reflects the tape of the Hernandez interview was played immediately after the noon recess. When the court reconvened, it indicated it was going to allow the prosecutor to play the tape. This must have been just after the prosecutor had the off-the-record discussion with the court and counsel, because the court simply announced its ruling without arguments and then indicated it understood the defense wanted to interpose a hearsay objection to admission of the taped interview. Certainly,

15

the court could not have known that unless there was a prior discussion off the record. While defense counsel objected to the tape on hearsay grounds, he never expressed surprise that Hernandez might not be available for trial.

The majority misreads the record when it repeatedly asserts the "prosecutor agreed the defense never got notice 'of possible deportation or ICE custody.' " For this proposition, the majority relies on the prosecutor's statement that he did not have "any indication there was a *formal notice or e-mail* of possible deportation or ICE custody." That there was no "formal notice or e-mail" does not mean there was no notice. Regardless, Solorio's testimony stands uncontradicted and establishes the prosecutor made defense counsel aware Hernandez's availability at trial was in doubt given his immigration status. This was sufficient given the prosecution's limited knowledge at the time.

Inexplicably, the majority later acknowledges the prosecution gave notice but finds it insufficient: "The prosecutors did not satisfy *Roldan* by mentioning, off the record, they were 'unsure of Mr. Hernandez's future availability due to his current immigration status at the time.' " This finding is troubling in several respects. First, there never has been a requirement in case law or statutes that written or "on the record" notice of a witness's potential deportation be given; the majority creates it out of whole cloth. I would leave it to the legislature to establish such a requirement, should it choose to do so.

16

Second, the majority's pronouncement leaves the state of the law unclear for prosecutors trying to comply with its dictates. Here, for example, the prosecutor gave notice to the defense of all she knew about Hernandez's immigration status at the preliminary hearing. As I have pointed out, at the preliminary hearing the prosecutor knew only that Hernandez was being charged with a felony and was in ICE custody, so she could not know whether Hernandez would be deported or convicted and incarcerated. Accordingly, she informed the court and counsel that she did not know what would happen to Hernandez in the future "due to his current immigration status." It is unclear what more the majority would require of the prosecutor to comply with its new standard. Must the words "might be deported" or "in ICE custody" be used to make the notice sufficient? All we know for certain now is that when a prosecutor informs the court and counsel, off the record but while court is in session, that a witness's future availability for trial is uncertain owing to his immigration status, it does not measure up. This type of ambiguity just underscores the importance of leaving such matters to the legislature, which is better suited to dictate the required method, content, and timing of notice obligations than an appellate panel can do by judicial fiat.

The other efforts the majority (and *Roldan*) set out as those which should have been undertaken to secure Hernandez's testimony inappropriately require the prosecution to take futile acts not likely to produce the witness for trial, which are not required by United States Supreme Court precedent. (*Ohio v. Roberts, supra,* 448 U.S. at pp. 74–76.) They amount to nothing more than the court's "ability to suggest additional steps" with the "benefit of hindsight," and which do not render the

17

prosecution's efforts unreasonable. (*Diaz, supra*, 95 Cal.App.4th at p. 706.) That such legal options may have been available is not the same as saying there was a meaningful possibility they would have prevented Hernandez's deportation. As the United States Supreme Court explained in *Ohio v. Roberts, supra*, 448 U.S. 56, although "[o]ne, in hindsight, may always think of other things," the prosecution need not make efforts for which there is a "great improbability" of locating the witness and producing him at trial. (*Id*. at pp. 75–76.) The prerequisite to due diligence is not about requiring the prosecution to compile a long list of efforts; it is about requiring measures that were likely to have been effective.

For example, I am not convinced the prosecution should or could have pursued the legal avenues discussed by the majority, such as seeking a detention order at the preliminary hearing, invoking federal regulations, or petitioning for a writ of habeas corpus from a federal court. As to a possible detention order, the majority fails to consider that to be effective, *the hold would have had to keep Hernandez in custody for the year that elapsed between the preliminary hearing and trial*. This was not possible under state law and would have violated Hernandez's constitutional rights. Indeed, "[t]he material witness provisions of the Penal Code are limited to requiring a bond to secure the witness's appearance, and a maximum *10 days* in custody for failure to post such a bond." (*Hovey, supra*, 44 Cal.3d at p. 564, italics in original.) Further, the California Constitution, article 1, section 10, forbids the unreasonable detention of witnesses. Due process

18

principles simply would not have permitted holding Hernandez as a material witness during the year-long period that elapsed following his preliminary hearing testimony on July 27, 2016, and the commencement of Torres's trial on July 24, 2017. In *Roldan*, the court considered this option reasonable because the witness only would have been held in custody for "a few more months until the time of trial." (*Roldan, supra*, 205 Cal.App.4th at p. 982.) It is also significant to note that during the period that elapsed between Torres's initial arraignment on the information on September 1, 2016, to the beginning of voir dire on July 19, 2017, defendant waived his right to a speedy trial 13 times. In other words, Torres never objected to the delays, and they were likely made at his request.

Neither is it apparent that the state could have relied upon federal regulations to delay Hernandez's departure. Even assuming a county prosecutor can invoke those regulations, they only allow a "temporary" delay in deportation. (8 C.F.R. § 215.2.) Further, they are set up to be self-executing by ICE. The Code of Federal Regulations mandate that a departure control officer "who knows or has reason to believe" a witness is needed for testimony "shall temporarily prevent the departure of such alien from the United States and shall serve him with a written temporary order directing him not to depart, or attempt to depart, from the United States until notified of the revocation of the orders." (8 C.F.R. § 215.3.) Here, ICE agents would have had reason to believe Hernandez was needed for trial given that he testified at the preliminary hearing, yet they did not prevent his departure.

Further, a writ of habeas corpus ad testificandum operates to bring a witness out of a detention facility to testify on a date

19

certain and to then be immediately returned to the detention facility.  (See *Barber v. Page* (1968) 390 U.S. 719, 724; *Atkins v. City of New York* (E.D.N.Y. 1994) 856 F.Supp. 755, 757; 28 U.S.C. § 2241.)  That would not have prevented Hernandez from being deported, because such a writ does not contemplate detaining a witness in custody for the purpose of testifying.

The majority claims informal contacts between federal and state law enforcement officials, which "share law enforcement objectives," might have been helpful. Here, the majority turns the real problem underlying these cases entirely on its head.  The problem underlying this genre of cases is that federal authorities do not cooperate with the state to hold off on deportation until a witness testifies at trial.  In *Roldan*, the witness became unavailable because federal authorities were unwilling to delay deportation until after a state criminal trial.  The state's investigator was told in *Roldan* "in so many words— that Barrera was going to be deported, and there was nothing he could do about it."  (*Roldan, supra*, 205 Cal.App.4th at p. 977.)  There, the federal government indicated it was only willing to "hold off deporting Barrera until after the preliminary hearing . . ." but "not [] to keep Barrera in custody beyond that time."  (*Id*. at p. 977.)  In this case, the only testimony on the subject was from ICE deportation officer Jason Henshaw, who said *in his five years working for the agency, he had never encountered a situation in which ICE delayed a deportation so that a witness could testify in a state criminal trial.*

20

In this case, the majority relies exclusively on Henshaw's testimony that "[w]hen an alien is brought into [ICE] custody, we usually run their criminal record for wants and warrants, and we'll reach out to the agency that usually has a want or [warrant] on that subject, if they want to take custody of that subject." The fact that ICE reaches out to agencies with wants and warrants on its detainees, however, is largely beside the point. Such actions would not have been enough to secure Hernandez's appearance at trial. Rather, ICE would have had to take the substantially more dramatic step of delaying his deportation. Henshaw never testified that ICE was willing to take that step. In fact, his testimony indicates it had never done so in all the years he worked with the agency. There is no evidence in the record to suggest this case would have been the first.

I am not asserting the prosecution did a stellar job of trying to prevent Hernandez from being deported. The real problem, however, is that there was no effective measure it could have undertaken to stop it from happening. Here, the prosecution took sufficient steps to meet the standard of good faith and due diligence—clearly as to its efforts as judged by *Herrera*, and barely under *Louis* and *Roldan*.

I do, however, strongly agree with the majority that this case needs to draw the attention of District Attorney administrators to the common problem caused by the federal government's unwillingness to wait for state trials before executing deportations. The District Attorney's Offices need to be made aware, if this case stands, of the new written notice requirement imposed by the majority and the ineffective yet rigorous lengths prosecutors must undertake to demonstrate a

21

witness is legally unavailable when that witness might be deported.

### *Harmless Error*

In addition, I would not reverse Torres's conviction because any error was harmless. A violation of a defendant's constitutional right to be confronted with the witnesses against him is harmless error if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24; see *People v. Arredondo* (2019) 8 Cal.5th 694, 709; *People v. Livingston* (2012) 53 Cal.4th 1145, 1159.) "An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." (*Coy v. Iowa* (1988) 487 U.S. 1012, 1021–1022.)

Here, even without Hernandez's testimony, there is overwhelming evidence to support the jury's verdict. This was a typical gang case where the victim recanted; the jury saw through it and convicted Torres of the charges. The evidence showed both Quinones and Torres were members of the Eastside Longos gang; Quinones's moniker was "Kid" and Torres's was "Terko." The jury heard a tape-recorded interview of Quinones by police on the day of the stabbing. In it, Quinones said he and "Terko" were from the same gang and had been "beefing" each other about "politics" for two weeks preceding the attack. Torres told

the police he could not describe the nature of the so-called political dispute because if he did, he would put his life and his family at risk.  In his preliminary hearing testimony—admitted at trial to impeach his partial recantation of the events—Quinones explained the dispute was because Torres thought he was trying to usurp his leadership position in the gang.  Text messages on Torres's phone confirm the dispute with Quinones:  prior to the attack, someone sent Torres a text message saying Quinones was "no good in gang culture anymore" and "should be targeted."  Torres's phone replied, "Been trying to let you know."

 Quinones told police that, on the night of the incident, Torres snuck up on him as he and his "cousin" Alex Hernandez left his girlfriend and daughter's home.  When Quinones saw Torres, he said, "You doing something—are you going to do something funny, boy?  Like just let me know, you know."  Quinones thought Torres had a gun.  Torres asked him:  "You think you can laugh at me and some shit like that?  You think you're funny?"  Torres pulled out a knife and stabbed Quinones in the chest.  Quinones jabbed Torres in the chin with his fist and took off running down the alley with Torres in pursuit.  When Quinones turned around, he said to Torres, "Come on, nigga.  Drop the knife.  Drop the knife.  Drop the knife, nigga."  At that point Torres stabbed him in the arm.  Someone screamed, "Call 911!" and Quinones ran to a nearby liquor store.  Torres walked away.

 Ronnie McAllistair called 911 on the night of the stabbing after seeing Quinones walking unusually in the alley with a wounded arm.  He reported that he saw a man bleeding extensively and did not know what happened, "but I don't think

he's going to make it too long." McAllistair said Quinones was near Mike's Liquor.

Marisa Orozco testified she was working at Mike's Liquor that night when Quinones came in and asked her to call for help because he had cuts on his arm and chest and was bleeding. Orozco called the police.

Approximately 15 minutes after the stabbing, Torres was stopped in an area close to the stabbing by Long Beach Police Officer Anthony Garcia, who had been given a description of his vehicle. Torres was in the driver's seat and his girlfriend was in the passenger seat. Thereafter, Officer Garcia arrested appellant.

As Garcia drove Torres to the police station, Torres asked the officer if he would be released "if the victim did not want to be a victim." Officer Garcia said he wasn't certain, but he believed "you need a victim for a crime." As they approached the police station, Torres asked again whether there was no crime if there was no victim. Officer Garcia said he could not be certain. Torres was taken into the police station, and he once again asked if he would be released if there was no victim.

Cell phone records placed Torres in the area of the stabbing at the time it occurred.

At trial, Quinones gave a dramatically different account of the incident, claiming, for the very first time, he was stabbed while both Hernandez and Torres were fighting him in the ally. Yet, unlike his pre-trial statements and testimony, his trial testimony was full of holes and inconsistencies. He alternated between insisting Hernandez stabbed him and having no idea who was

24

responsible. He failed to explain why he would get in a car with Hernandez almost immediately after being viciously attacked by him. He provided less than convincing—and ever-changing—reasons for altering his testimony so dramatically at trial. He was not even consistent as to whether he intentionally lied at the preliminary hearing or was simply mistaken. The prosecutor quite accurately described Quinones's recantation at trial as "nonsense" and "a bunch of crazy stuff."

The question to resolve is whether the jury would have convicted Torres on this record and in the absence of Hernandez's testimony. I am confident, beyond a reasonable doubt, it would have.

The jury found Torres personally used a knife in the commission of the offenses, so the verdict reflects it did not believe Quinones's "crazy" recantation at trial. I come to the same conclusion. Quinones's pre-trial statements to police and preliminary hearing testimony provided a consistent, coherent, and compelling account of the stabbing: he had a "beef" with Torres over gang "politics"; Torres alone attacked and stabbed him; and Hernandez—whom Quinones referred to as his cousin—was present but not involved in the fight. Quinones's pre-trial account is also consistent with the other evidence presented at trial. Further, Torres fled the scene of the stabbing in a car—showing a consciousness of guilt. Hernandez, in complete contrast, remained in the area and cooperated with police in their investigation.

Torres' repeated questions to police about whether there would be a crime if there was no victim, made during his arrest and immediately after the stabbing, show he knew he committed the crime and that he was already hatching a plan to get off the

25

hook for it.  Even the majority acknowledges the questions tend to incriminate him.  Enigmatically, the majority then concedes only that "Torres's questions tend to incriminate him of victimizing someone in some way . . . ."  Torres's questions cannot be taken out of the context in which they were made—right after the stabbing, while he was under arrest for the stabbing.  When properly considered in this setting, the statements can only be interpreted to incriminate Torres of stabbing Quinones.

To the extent the majority accepts Quinones's explanation that his prior testimony and statements were the result of being "drugged up," it is misguided.  First and foremost, Torres was likely claiming he was high on drugs to further intentionally discredit his own testimony.  Regardless, being high on methamphetamine, or any drug for that matter, does not cause someone to lie.  It does not result in a consistent and logical, yet completely false, account of events.  Nor does it make someone blame one attacker but not the other.

In some cases, I would be reluctant to accord great weight to statements and testimony from a witness who behaved like Quinones.  But I cannot view his statements and testimony in a vacuum; nor must I put aside common sense when performing a harmless error analysis.  This is a gang case; recantation is common.  As the People's gang expert explained, those who testify against the Eastside Longos gang do so at great risk to their personal safety and the safety of their families.  Even Quinones admitted at trial he was fearful his testimony about Torres would put his friends and family at risk.

26

The majority briefly notes that recantation is common in gang cases. Unfortunately, I believe an acknowledgement of that fact is as far as the majority goes. It's entirely different to recognize a recantation when it's present and to give it the weight, or lack thereof, when it transpires. Here, I think it clear that Quinones lied at trial to avoid repercussions for testifying against his gang. His pre-trial statements, in contrast, were sincere and truthful. Considered with the other properly admitted evidence, they establish beyond a reasonable doubt that Torres stabbed Quinones with the intent to kill.[2]

### *Prior Conviction Enhancements*

Although I would affirm Torres's convictions for attempted premeditated murder and assault with a deadly weapon, I would agree with the majority that it was error to impose the prior conviction sentencing enhancements. When the People allege a prior conviction sentencing enhancement, the defendant has a statutory right to a trial on the factual issues raised by a denial of those allegations. (Pen. Code, §§ 1025, 1158; see *People v. Epps* (2001) 25 Cal.4th 19, 23.) As the majority notes, the docket entries do not show a trial on the prior conviction allegations, and there is no other record of such a trial. The trial court's brief remark implying the trial occurred is not sufficient. Therefore, I would strike the prior conviction sentencing enhancements and

---

[2] The majority faults the Attorney General for making "a halfhearted effort to marshal proof of guilt" and insinuates he did not make a long analysis of harmless error because Quinones recanted. I would not speculate at the reason behind the length of an argument in a respondent's brief. A short argument can equally be attributed to overconfidence, a demanding workload, or a myriad of other reasons.

remand the case for a new trial on the prior conviction allegations.

BIGELOW, P. J.